# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

No. _16- 3010 - cmm_

IN RE:

CRIMINAL COMPLAINT

_____/

## CRIMINAL COVER SHEET

1.  Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to October 14, 2003?  _____ Yes  _X_ No

2.  Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to September 1, 2007?  _____ Yes  _X_ No

Respectfully submitted,

WIFREDO A. FERRER
UNITED STATES ATTORNEY

BY:  _____
KAREN E. GILBERT
Assistant United States Attorney
Florida Bar No. 771007
United States Attorney's Office
99 N.E. 4th Street, 8th Floor
Miami, Florida 33132
Telephone: (305) 961-9161
Facsimile: (305) 536-4675
Karen.Gilbert@usdoj.gov

AO 91 (Rev. 08/09)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
Southern District of Florida

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| | ) | Case No.  16-3010-cmm |
| Gregory Hubbard, | ) | |
| Dayne Antani Christian, and | ) | |
| Darren Arness Jackson, | ) | |
| _Defendant(s)_ | ) | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of  ____April 2015 - July 21, 2016____  in the county of  _Miami-Dade and Palm Beach_  in the

____Southern____  District of  ____Florida____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2339B(a)(1) | Conspiring and Attempting to Provide Material Support and Resources to a Designated Foreign Terrorist Organization; and |
| 18 U.S.C. § 922(g)(1) | As to Dayne Christian only:<br>Felon in Possession of a Firearm and Ammunition |

This criminal complaint is based on these facts:

See attached affidavit of Special Agent Brian King, Federal Bureau of Investigation.

☑ Continued on the attached sheet.

_____
_Complainant's signature_

Special Agent Brian King, FBI
_Printed name and title_

Sworn to before me and signed in my presence.

Date:  __7-22-16__

_____
_Judge's signature_

City and state:  _____Miami, Florida_____

U.S. Magistrate Judge Chris M. McAliley
_Printed name and title_

## AFFIDAVIT

I, Special Agent Brian King, first being duly sworn, depose and state the following:

### Introduction

1.      I make this affidavit in support of an application for a criminal complaint and ~~and arrest warrants~~ charging GREGORY HUBBARD, DAYNE ANTANI CHRISTIAN, and DARREN ARNESS JACKSON with violating 18 U.S.C. §§ 2339B(a)(1) and 2, in that they did knowingly conspire and attempt to provide material support and resources to a designated Foreign Terrorist Organization, that is, the Islamic State of Iraq and the Levant.  Further, this affidavit is submitted in support of an application for a criminal complaint and ~~and arrest warrant~~ charging DAYNE ANTANI CHRISTIAN with violating 18 U.S.C. § 922(g)(1), in that, having previously been convicted of a crime punishable by imprisonment for a term exceeding one (1) year, he did knowingly possess a firearm in and affecting interstate and foreign commerce.

2.      I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have worked in that capacity for thirteen years.  I am currently assigned to the FBI's Miami Field Division, West Palm Beach Resident Agency.  I work on an FBI counterterrorism squad, which is part of the South Florida Joint Terrorism Task Force ("JTTF").  As such, I am responsible for the investigation of violations of federal law, including federal laws relating to international terrorism, national security, terrorism support activities, and firearms and other weapons offenses.

3.      I am familiar with the facts and circumstances set forth in this affidavit as a result of my participation in the investigation; as a result of my experience, training, and background as a Special Agent with the FBI and with the JTTF; as a result of personal observations and examination of relevant evidence; and as a result of information provided to me by other law

enforcement officers and witnesses. The information contained in this affidavit is not inclusive of all the facts of the investigation and is provided for the limited purpose of establishing probable cause to obtain a criminal complaint. I have listened to the audio recordings of the meetings in this case and other FBI employees have prepared draft transcripts of these audio recordings. I have reviewed these transcripts but have not undertaken a precise comparison of the words on the audio recordings with the words on the transcripts. That being said, my general review of these draft transcripts indicates that they are accurate and comport with my personal knowledge of pertinent meetings. Accordingly, I am relying on these draft transcripts prepared by other FBI employees for the quoted conversation excerpts included in this affidavit. All meetings discussed in this affidavit, except one noted below, were recorded.

4.     A person violates 18 U.S.C. § 2339B(a)(1) as follows:

Whoever knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so....To violate this paragraph, a person must have knowledge that the organization is a designated terrorist organization....or that the organization has engaged or engages in terrorist activity.

5.     Section 2339B(g)(4) and 18 U.S.C. § 2339A(b)(1)-(3) define "material support or resources" as follows:

[T]he term 'material support or resources,' means any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials;

[T]he term 'training' means instruction or teaching designed to impart a specific skill, as opposed to general knowledge;

[T]he term 'expert advice or assistance' means advice or assistance derived from scientific, technical or other specialized knowledge.

2

6.    A person violates 18 U.S.C. § 922(g)(1) as follows:

It shall be unlawful for any person—

Who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year;

….

To…possess in or affecting interstate or foreign commerce, any firearm or ammunition...

7.    On October 15, 2014, the United States Secretary of State designated al-Qa'ida in Iraq ("AQI"), then known as Jam'at al Tawhid wa'al-Jihad, as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist under Section 1(b) of Executive Order 13224.  On May 15, 2014, the Secretary of State amended the designation of AQI as an FTO under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under Section 1(b) of Executive Order 13224 to add the alias Islamic State of Iraq and the Levant ("ISIL") as its primary name.  The Secretary also added the following aliases to the ISIL listing: the Islamic State of Iraq and al-Sham ("ISIS"), the Islamic State of Iraq and Syria ("ISIS"), ad-Dawla al-Islamiyya fi al-'Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and Al-Furqan Establishment for Media Production.  On September 21, 2015, the Secretary added the following aliases to the ISIL listing: Islamic State, ISIL, and ISIS.  Although the group has never called itself "Al-Qaeda in Iraq," this name has frequently been used to describe it through its history.  To date, ISIL remains a designated FTO.

8.    Based on my training and experience, I know that Sunni extremists, who are not citizens or residents of Syria, Iraq, or Libya, have traveled to those countries to join ISIL and often enter by crossing the border from a neighboring country.  Moreover, I am aware that

3

foreign fighters from Western countries, including the United States, have traveled to locations in Turkey, including Istanbul, and then traveled to towns closer to the border with Syria, where they are then brought across to join ISIL. Based on my training and experience, I know that an individual named Abu Bakr al-Baghdadi is the current leader of ISIL and that the online magazine Dabiq is a recruitment publication for ISIL.

### Defendants

9.    GREGORY HUBBARD ("HUBBARD"), who uses the alias "JIBREEL" (Phonetic), is the subject of an FBI counterterrorism investigation which has determined that HUBBARD advocates for and supports violent jihad. HUBBARD is a 52-year-old United States citizen residing in West Palm Beach, Florida, who has professed support for ISIL and acts of terrorism attributed to ISIL. HUBBARD has also expressed his desire to travel to Syria and join ISIL for the purpose of engaging in violent jihad. HUBBARD has regularly spoken about his support of ISIL and his support for deadly terrorist attacks, such as the mass shootings in San Bernardino, California, and Orlando, Florida. HUBBARD has also regularly vocalized his support for the killing of non-Muslim hostages, as depicted in beheading videos disseminated over the Internet as ISIL propaganda.

10.    On or about July 30, 2015, HUBBARD stated to an FBI Confidential Human Source ("CHS") that an individual known as "SHAKUR" was in touch with individuals in Syria affiliated with ISIL. The CHS was posing as an ISIL follower who wanted to travel to Syria to engage in violent jihad. Then, on or about August 15, 2015, HUBBARD introduced the CHS to "SHAKUR," later identified as DAYNE ANTANI CHRISTIAN ("CHRISTIAN"), a 31-year-old United States citizen residing in Lake Park, Florida. CHRISTIAN stated that he was in contact with a Syrian national inside Syria who was a member of ISIL. CHRISTIAN stated that he

wanted to travel to Syria and join ISIL to engage in violent jihad and that this was "the only option." The FBI has determined that CHRISTIAN has advocated for and supported violent jihad, with particular emphasis on ISIL and acts of terrorism attributed to ISIL. Like HUBBARD, CHRISTIAN has regularly talked about his support for ISIL and deadly terrorist attacks, such as the mass shooting in Orlando.

11.    HUBBARD and CHRISTIAN have used the coded phrase "soccer team" when referring to ISIL and the phrase "playing soccer" when referring to joining ISIL for the purpose of engaging in violent jihad.

12.    According to National Crime Information Center records, CHRISTIAN is a convicted felon, having been arrested by the West Palm Beach Office of the Bureau of Alcohol, Tobacco, Firearms and Explosives on or about December 11, 2009. CHRISTIAN was convicted on or about May 25, 2010, for the offense of making a false statement to a firearms dealer in connection with the acquisition of firearms and was sentenced to one year and one day in prison.

13.    On or about May 11, 2016, HUBBARD introduced the CHS to an individual known as "DAOUD" (Phonetic). This individual was later identified as DARREN ARNESS JACKSON ("JACKSON"), a 50-year-old United States citizen residing in West Palm Beach, Florida. The FBI has determined that JACKSON too has advocated for and supported violent jihad, with particular emphasis on ISIL and acts of terrorism attributed to ISIL. According to HUBBARD, JACKSON had previously intended to travel overseas with HUBBARD to join ISIL for the purpose of engaging in violent jihad. More recently, JACKSON has stated that he wanted to learn Arabic and then travel overseas to join ISIL. On the same date HUBBARD introduced the CHS to JACKSON, all three individuals conducted target practice at a local shooting range. While there, HUBBARD, JACKSON, and the CHS fired two semi-automatic

pistols, which had been provided by JACKSON. Both HUBBARD and JACKSON stated that they felt persecuted because of their Islamic faith and that they thought the other individuals at the shooting range were training to kill Muslims.

## Background of Investigation and Statement of Probable Cause

14.     On or about April 11, 2015, HUBBARD told the CHS that he was thinking about joining ISIL and then emailed the CHS a 100-page ebook published by ISIL. This was a manual for ISIL supporters. HUBBARD justified his support for ISIL by explaining that they had established a true Caliphate, with currency, laws, and charities, all set up according to Islamic law. HUBBARD stated to the CHS that he had written two articles and sent them to ISIL for publication, and that he was working on a third article. The subject of this last article was the media's coverage of ISIL and what was wrong with it.

15.     On or about August 25, 2015, HUBBARD brought paperwork to the CHS's residence to apply for a renewal of his United States passport. HUBBARD left the passport paperwork on the CHS's table. The paperwork was later mailed with instructions that HUBBARD's new passport be sent to the CHS's residence.

16.     On or about October 2, 2015, HUBBARD informed the CHS that there are only two kinds of people, those who were with ISIL and those who were against ISIL. HUBBARD discussed how he was getting in shape and how ISIL was exciting.

17.     On or about October 20, 2015, HUBBARD stated that CHRISTIAN had been radicalizing a known individual by having him watch lectures and sermons by Anwar al-Awlaki and like-minded clerics. Anwar al-Awlaki was an Islamic lecturer and a leader of al-Qa'ida in the Arabian Peninsula ("AQAP"), a Yemen-based FTO that has claimed responsibility for terrorist acts against targets in the United States, Saudi Arabia, Korea, and Yemen since its

inception in January 2009. Pursuant to a Presidential Executive Order, al-Awlaki was designated by the United States as a Specially Designated Global Terrorist on July 12, 2010. Al-Awlaki was reportedly killed in Yemen in September 2011.

18.     On or about November 2, 2015, the CHS asked HUBBARD if it was safe to communicate with people in Syria affiliated with ISIL. HUBBARD stated that he did not know, but cautioned that "you do not want to get busted on the way there," a reference to traveling to Syria to join ISIL. HUBBARD professed that "jihad is the skin of Islam," the outer layer protecting the religion's body. The CHS asked HUBBARD if there was a manual for "the soccer team" that explained all the details. HUBBARD responded affirmatively and that it showed the currency and everything. According to HUBBARD, the manual (which HUBBARD had already sent to the CHS in ebook form) was detailed and one hundred pages long. HUBBARD told the CHS that he still had the manual, which he sent to the CHS a second time. The CHS asked HUBBARD if he had a reliable source, meaning someone who had information on ISIL. HUBBARD mentioned Internet videos and that the CHS would need to ask CHRISTIAN. HUBBARD counseled the CHS that the only way to deal with one's enemy was to "cut off his head, cut his head off, sometimes you just have to cut heads off."

19.     On or about December 5, 2015, HUBBARD and the CHS were eating at a local restaurant where a television was broadcasting news of the mass shooting in San Bernardino. The news reported that the attack had been committed in the name of ISIL. HUBBARD asked the CHS what he/she thought about it, and the CHS explained that it was a tragedy. HUBBARD grew upset, stood up suddenly, and loudly exclaimed that he did not care how many Americans and Infidels were killed. HUBBARD later expressed to the CHS that he did not care if people noticed his outburst.

20.     On or about December 9, 2015, the CHS provided HUBBARD with his (HUBBARD's) new passport, which had been sent to the CHS's residence. When HUBBARD saw his passport, he grew excited and stated that it is time, referring to time to travel to Syria to join ISIL. HUBBARD elaborated that everyone had to decide which side they were on, the side of ISIL or the side of those who do not support it. HUBBARD indicated that he was on the side of ISIL. HUBBARD asked the CHS to keep his passport so that HUBBARD would know it was safe and would not lose it.

21.     On or about December 12, 2015, while HUBBARD, CHRISTIAN, and the CHS were traveling in a car, CHRISTIAN played recorded lectures on his telephone advocating jihad so that HUBBARD and the CHS could listen. CHRISTIAN stated that after the recent mass shooting in San Bernardino, his boss had asked him how he felt about the attack. CHRISTIAN replied by showing his boss a video on how civilian deaths from U.S. military operations were never talked about by the media and that Muslims had a right to defend themselves. CHRISTIAN further commented on the trip that Muslims were waging an offensive jihad and that they had the right to do whatever was necessary to win. HUBBARD stated that the current war in Syria provided grounds for offensive jihad and justified attacks like the San Bernardino shooting.

22.     On or about December 26, 2015, HUBBARD, CHRISTIAN and the CHS discussed Nidal Hasan, the U.S. Army officer who had committed a mass shooting at Fort Hood, Texas, in 2009. This led to a discussion about the relative merits of various types of firearms. HUBBARD got excited and spoke about the advantages of the type of gun that Hasan had used (that he had chosen a nice gun to "put an end to someone"). CHRISTIAN asked HUBBARD what happened to the firearm he (HUBBARD) had agreed to bring him. HUBBARD stated that

8

he could obtain a "piece" for CHRISTIAN, and CHRISTIAN in turn told the CHS that if he/she wanted one, CHRISTIAN could obtain a firearm for him/her as well. CHRISTIAN also stated that he hoped they would start training soon.

23.     CHRISTIAN talked about seeing U.S. military personnel at the gym and how he wanted to follow them home from the gym and then walk up behind them and "pop," at which point CHRISTIAN made a gunshot sound. HUBBARD said that CHRISTIAN could do that because he (CHRISTIAN) was at war with the U.S. military. CHRISTIAN said that he wanted to target a certain unidentified male from the gym who had worn a U.S. Marines shirt. CHRISTIAN said that he could hide in the bushes outside this victim's house for two hours and wait for him to come home and then "pop."

24.     On or about January 10, 2016, HUBBARD, CHRISTIAN, another known individual, and the CHS met at a local restaurant. CHRISTIAN mentioned shooting and teaching someone how to shoot. CHRISTIAN stated that he has some "real stuff," a reference to actual firearms they can shoot, and that they need to find a place where someone will not call the police. CHRISTIAN added that if he got caught with "all that stuff," then it's over for him, a reference to the fact he would go to jail as a convicted felon who could not possess a firearm. CHRISTIAN emphasized that "he can't be around that stuff." The group discussed various rural locations in South Florida for target practice.

25.     HUBBARD mentioned that he will take some people with him if he leaves here, meaning the United States, when he travels overseas to join ISIL. CHRISTIAN responded that it is verified and that it is only a matter of time. CHRISTIAN further mentioned Anwar al-Awlaki and expressed that it cannot get any better than that. CHRISTIAN then discussed both "a carbon 15," a likely reference to an AR-15 assault rifle, and a new "Kalashnikov," a reference to an AK-

9

47 style assault rifle. CHRISTIAN stated he has had "a lot of them" and that he has one now which cost him $400 on the street, but that he had to acquire ammunition for it. CHRISTIAN referred to the Kalashnikov as "our sword." CHRISTIAN also talked about how he would pay top dollar for an Uzi, a type of sub-machine gun.

26.     HUBBARD raised the issue of killing civilians, and used the phrase "tak[ing] everyone down" before leaving the United States, and CHRISTIAN responded, "Oh yeah." CHRISTIAN stated that there are some people he was thinking about "taking out" tomorrow. HUBBARD asked CHRISTIAN if you can "take somebody out" because legally you are at war with them. CHRISTIAN responded that, if you know for sure that this person is going to fight your brothers, then you can stop them. HUBBARD then referenced the Fort Hood mass shooting, commenting "that is what the brother did out in Texas and he was absolutely right." CHRISTIAN encouraged HUBBARD to follow suit, "You do so, you do so." HUBBARD reaffirmed that the Fort Hood shooter had done the right thing.

27.     On or about February 17, 2016, HUBBARD stated to the CHS that he wanted to bring America to its knees and that it would be a big splash if the "soccer team" would attack the Pentagon. HUBBARD added that it would be a glorious day for "the movement." HUBBARD also mentioned the White House as a possible target. HUBBARD made an exploding sound when talking about the Pentagon attack and stated that he was talking about not leaving "a pebble in the parking lot." After the CHS mentioned that the Pentagon was a difficult target, HUBBARD responded that then the White House should be attacked on a day when there is a high-profile meeting, and made another explosion noise for emphasis.

28.     On or about February 19, 2016, CHRISTIAN told the CHS, "I have an AK, so we can go shoot." CHRISTIAN added, "I have one like this big and another regular size." The

CHS asked CHRISTIAN how big the AK-47 was and how much it would cost on the street. CHRISTIAN responded, "It's like this big" and "like 200 dollars." CHRISTIAN talked about going to gun shows and dealing with brokers who do not check IDs. CHRISTIAN added that the standard magazine for an AK-47 contains 30 rounds and that he was "trying to buy a hundred rounds" from someone.

29.    CHRISTIAN and the CHS discussed where to buy ammunition, and though CHRISTIAN suggested Wal-Mart, he cautioned that Wal-Mart asks for ID so he cannot buy there.  CHRISTIAN and the CHS discussed acquiring "about 200 AK rounds" and how "it should be enough" for firearms training.  CHRISTIAN recounted that he had 12 assault rifles before he went to prison.  CHRISTIAN stated, "I have like a magazine that holds 30 rounds for right now."  CHRISTIAN showed the CHS pictures of his AK-47 rifle and pistol.  CHRISTIAN stated he had acquired one of his firearms from a man who gets him "stuff."  CHRISTIAN then stated, "I bought this one from him," and that he (CHRISTIAN) had "got that one for 400."  CHRISTIAN told the CHS that the magazine was not in the gun but that "I have them at my house."  CHRISTIAN also told the CHS that "you can get the serial number grinded."

30.    On or about March 3, 2016, HUBBARD mentioned to the CHS that, when he does something, he does it big.  HUBBARD also advised he was getting very serious and wanted to leave the United States to join the Islamic State soon.  HUBBARD claimed that he was close to being ready and planned to put his personal belongings in storage in Georgia.  HUBBARD stated he was "just set on forgetting this Duyna [this world] and sell what I can sell, make my money, get my flight and just go."  The CHS asked HUBBARD if he was going to fly one way.  HUBBARD responded, "I have to go two ways, just for security reasons."  HUBBARD stated

11

that he is "conditioned to play soccer, want to be a soccer player." HUBBARD added that he needed "probably about $10,000-$15,000" for his travel to the Islamic State.

31.     On or about March 29, 2016, during a discussion of the terrorist attacks in Belgium, HUBBARD pointed out to the CHS the lack of attention given to the deaths of Muslims, as opposed to the media coverage of attacks in the West. HUBBARD reiterated his intention to leave for Syria to join ISIL, which he explained would be during the summer of 2016, and to not return to the United States.

32.     On or about May 14, 2016, HUBBARD stated to the CHS that he intended to depart the United States and was more adamant than usual regarding his plans to travel to Syria to join ISIL. HUBBARD indicated that he was tired of meeting the CHS for coffee and that he was ready to go.

33.     On or about May 17, 2016, HUBBARD solicited the CHS's assistance and asked about the best routes of travel to Syria. HUBBARD stated that he planned to rent a U-Haul truck and remove his personal belongings from a storage facility in West Palm Beach and move them to Georgia.

34.     On or about May 23, 2016, CHRISTIAN sent text messages via a social media platform containing a link to an audio recording released by an ISIL spokesman named Mohammed al-Adnani. CHRISTIAN also sent written versions of the statement in English and Arabic. On or about May 21, 2016, al-Adnani had released this statement, which threatened the United States and Europe with attacks during Ramadan and called on ISIL supporters to take action in "the heartland." Al-Adnani had also emphasized targeting civilians. HUBBARD sent a response to CHRISTIAN stating that he was unable to open the attachment. HUBBARD later forwarded the same link originally sent by CHRISTIAN to the CHS.

12

35.     On or about May 27 and 28, 2016, HUBBARD loaded his personal belongings into a Budget rental truck for transport to Albany, Georgia.  These belongings had been kept in a storage unit in West Palm Beach, Florida.  HUBBARD also loaded two long gun/rifle cases. Additional personal items were kept in HUBBARD's van and he transferred them as well into the rental truck.  HUBBARD intended to sell the van upon his return from Georgia.

36.     On or about May 30, 2016, HUBBARD unloaded the items from the Budget rental truck into a storage unit in Albany, Georgia.

37.     On or about June 3, 2016, HUBBARD, CHRISTIAN and the CHS met and discussed ISIL and its activities.  HUBBARD mentioned a beheading video which he had shown to the CHS.  CHRISTIAN was already aware of the video and mentioned another video which showed ISIL members crushing an individual's skull with a large rock.  HUBBARD and CHRISTIAN both expressed favorable views of the video with Arabic expressions like "mashallah," which translates as "how wonderful."

38.     On or about June 5, 2016, CHRISTIAN and HUBBARD met with the CHS at a residence in Royal Palm Beach, Florida.  At this meeting CHRISTIAN handed the CHS a Mossberg International 715P .22 caliber semi-automatic pistol (Serial No. EMJ3965915), which was to be used for target practice with HUBBARD.  The weapon included a magazine with approximately 25 rounds of ammunition.  The Mossberg had been manufactured in Brazil, and thus had moved in foreign commerce.  HUBBARD and the CHS made plans to shoot the Mossberg 715P on or about June 8, 2016.  CHRISTIAN also displayed a semi-automatic pistol to the CHS, which he claimed to carry at all times.  CHRISTIAN talked about various guns and round sizes and boasted that he only used ammunition that would inflict maximum damage:

> Normally I don't do .22, that goes against my motto, I'm not gonna buy something that's an assault rifle that shoots a pistol round, .22, 9, 40, 45. 'Cause I figure if I got an assault rifle, I don't want it to shoot a round that a pistol use...I want something that's gonna take your leg off if I hit your leg or take your arm off if I hit your arm, that's just me but me and my situation, being a thug, I buy my stuff off the street, those are clean, the guy I bought those from he had...

39.     At this same meeting CHRISTIAN stated that he had sought to acquire a firearm manufactured by "FN," the shorthand name for a company known for high quality weapons. HUBBARD commented that he wished that he had an FN firearm because there are a few people he would like to "take out." CHRISTIAN spoke about his federal charges not showing up "on your average background check, it doesn't come up..." CHRISTIAN added, "Do you know because of my charges, it's illegal for my wife to own a gun, she can't own a gun, her record is squeaky clean but because she's married to me, she can't own a gun because her gun is not allowed to be around me..." CHRISTIAN emphasized that "I refuse to put a gun down...I will always protect my family, my wife. I'm gonna teach her to use that..."

40.     Also at this meeting the conversation turned to ISIL's ongoing fight to establish the Caliphate. HUBBARD first told the group that they need a code word when talking about ISIL so that they can hide what they are speaking about. CHRISTIAN explained how he must take precautions because his ISIL associates are under surveillance:

> I was talking to my little brother and he was like just be careful. He knows I'm with Dawla [ISIL] so please watch what you say on the phone. I told my little brother, I said look, the people I'm in contact with there's no doubt in my mind that they're watching them. I know they're watching, I know they are...

HUBBARD commented that this was a time for fighting because the Islamic State had not been securely established, "This is not the Dawla, we're in a time for jihad, we're not in the time for Dawla, we're in the time of jihad." CHRISTIAN added, "It's just me, I can't be fake. I'm gonna call it like it is...what about our brothers and sisters in Syria we are losing..." CHRISTIAN

14

asked HUBBARD, "So, you are ready to go?," and quoted Abu Bakr al-Baghdadi, the leader of

ISIL, who encouraged attacks in the West:

> For those of you abroad who wish to join us, repent because your country will not
> allow you to travel...if we were in your shoes, we would perform operations in
> those countries, you're wishing to come over here to support us...but if we had
> the opportunity that you guys have in our own lands to wreak havoc, we would do
> the same thing.

41.     On or about June 7, 2016, the CHS was with HUBBARD when he booked a

roundtrip airplane ticket through Orbitz.com from Miami, Florida, to Berlin, Germany. The plan

was to travel to Europe on his journey to Syria, and that the CHS would accompany HUBBARD

on the trip. HUBBARD would depart Miami on July 21, 2016, and connect through Newark,

New Jersey, to Berlin, arriving on July 22, 2016. The return ticket was booked for August 15,

2016, which, according to HUBBARD's plan, would give the appearance that HUBBARD and

the CHS were visiting Europe for three weeks. HUBBARD used his laptop computer and Visa

debit card to book his ticket, which cost approximately $1,008. HUBBARD also researched and

discussed taking a train from Berlin to Istanbul, Turkey, but decided to purchase the train ticket

later. After booking the airline tickets, HUBBARD played a lecture by Anwar al-Awlaki on his

cellular telephone concerning what separates true believers from hypocrites. A few days after

making these arrangements, HUBBARD sold his van.

42.     On or about June 8, 2016, HUBBARD and the CHS met at an indoor shooting

range. HUBBARD brought four weapons to the range, a .22 caliber "survival rifle," a KelTec

9mm Luger pistol, a .40 caliber Ruger pistol, and the Mossberg 715P .22 caliber semi-automatic

pistol that CHRISTIAN had previously given them. HUBBARD stated that he had picked up the

9mm pistol from CHRISTIAN earlier that day. The CHS observed that HUBBARD was very

serious about the firearms training and that HUBBARD provided instruction on how to handle the weapons.

43.     On or about June 19, 2016, HUBBARD and CHRISTIAN met with the CHS, but prior to CHRISTIAN's arrival, HUBBARD and the CHS discussed booking a hotel in Berlin and the train from Berlin to Istanbul.  HUBBARD was hesitant to book the train tickets at that point because he did not want to draw attention from the government.  Upon his arrival CHRISTIAN played a sermon on his telephone praising Usama bin Laden.  In reference to the Pulse nightclub attack in Orlando, CHRISTIAN stated, "The nightclub was a soft target and regardless if they are gay or not, it was blood for blood and it was an added bonus that they were gay."  CHRISTIAN elaborated that they were "engaged in war with the kuffar" and that such acts are justified during a time of war ("You can kill them."):

> Dawla released a video in response to this attack and they mentioned nothing about punishing homosexuals, it was blood for blood, it's just a soft target, hey we're gonna perform operations.  I knew this was coming from the speech of a brother...we're gonna execute an operation in America.  Hey what other place better, listen just add a couple of sprinkles and some strawberries frosting on top of it, they're gays.

44.     At this same meeting CHRISTIAN brought a bag containing three firearms.  Two of the weapons were not taken out of the bag, but the CHS could see that they were a semi-automatic pistol and a mini sub-machine gun.  The sub-machine gun was black and distinct from the Mossberg 715P that CHRISTIAN had loaned to HUBBARD and the CHS.  The CHS had indicated to CHRISTIAN, both directly and through HUBBARD, that he/she was interested in purchasing a firearm.  In response, CHRISTIAN brought the third firearm to the meeting, the KelTec 9mm Luger pistol that HUBBARD and the CHS had used for target practice on or about June 8, 2016.  CHRISTIAN stated that the weapon cost "5" ($500).  CHRISTIAN agreed to meet

HUBBARD and the CHS on or about June 24, 2016, when he would allow them to borrow his AK-47 style assault rifle.

45.     On or about June 20, 2016, HUBBARD and the CHS went online together and booked a hotel reservation in Berlin for July 22, 2016.  According to HUBBARD's plan, booking the hotel would make HUBBARD and the CHS appear as legitimate tourists.

46.     On or about June 24, 2016, the CHS picked up HUBBARD from his apartment and asked HUBBARD to send CHRISTIAN a message and he will meet him for "the item," a reference to the AK-47 style assault rifle.  A little later on, CHRISTIAN met with HUBBARD and the CHS, at which point both HUBBARD and CHRISTIAN commented that killing the "kuffar" is permissible during times of war.  The CHS asked CHRISTIAN if he still has the firearm and CHRISTIAN advised he still had the "Kalashnikov" and that he will provide it to him/her.  CHRISTIAN invited the CHS to pick up the weapon at his residence.  HUBBARD told CHRISTIAN that if he (HUBBARD) must leave town, he would leave CHRISTIAN his ammunition for "his (CHRISTIAN's) own mission."  When the CHS inquired what this meant, HUBBARD advised that he was serious.  CHRISTIAN then stated that he has thought of "pulling something off" at one of the gyms he frequents.

47.     On or about June 26, 2016, the CHS received a text message from CHRISTIAN advising that "the Bible," a code word for the AK-47 style assault rifle, was ready to be picked up.  The CHS drove to CHRISTIAN's residence in Lake Park, Florida, where CHRISTIAN came outside with the rifle (Serial No. MF9479) wrapped in a sweater.  This weapon had been manufactured in Romania and imported into the United States through Vermont, and thus had traveled in interstate and foreign commerce.  CHRISTIAN also provided the CHS with one magazine and 20 rounds of Winchester 7.62 x 39mm ammunition.  The CHS commented that

17

this was the type of heavy weaponry he/she and HUBBARD would need to use in Syria. CHRISTIAN agreed and smiled. CHRISTIAN advised that his ISIL contacts had been compromised and that he would attempt to identify new contacts who could help HUBBARD and the CHS in Syria. CHRISTIAN advised that he was getting his affairs in order and that, Allah willing, he and his family would travel to Syria as well. This meeting was not recorded.

48.     On or about June 30, 2016, HUBBARD sent a group text message to the CHS. The message contained a link to an Anwar al-Awlaki video. The lecture encouraged violent jihad and CHRISTIAN responded to HUBBARD's text message, stating that any Muslim of sanity would follow al-Awlaki's guidance.

49.     On or about July 6, 2016, CHRISTIAN and the CHS met to discuss payment for the KelTec 9mm Luger pistol that CHRISTIAN had provided to the CHS on or about June 19, 2016. The CHS offered CHRISTIAN $500 for the pistol and CHRISTIAN responded that $500 was too much. The CHS then handed CHRISTIAN an envelope with $300 and CHRISTIAN accepted it. CHRISTIAN asked, "When are you guys leaving?" The CHS responded that they would depart on July 21.

50.     On or about July 9, 2016, HUBBARD, JACKSON, the CHS, and another known individual went shooting at a remote South Florida wildlife management area. The group initially shot pistols and, after lunch, the group began shooting rifles, to include CHRISTIAN's AK-47 style assault rifle. JACKSON himself brought two pistols (one 9mm and one .40 caliber), two AK-47 style assault rifles, and a shotgun.

51.     On or about July 12, 2016, CHRISTIAN and the CHS met for lunch and discussed how many people know that HUBBARD is traveling to Syria to join ISIL. CHRISTIAN agreed with the CHS that everyone knew. According to CHRISTIAN, HUBBARD

18

had told him that he was going to Syria to get training and that he was coming back. The CHS told CHRISTIAN that he/she was going with HUBBARD but that he/she was not staying. The CHS mentioned JACKSON's firearms from the target practice session and CHRISTIAN responded that JACKSON also had two pistols. The CHS confirmed to CHRISTIAN that he/she and HUBBARD were departing on July 21.

52.    On or about July 14, 2016, JACKSON agreed to take HUBBARD and the CHS to Miami International Airport. JACKSON said he knew of HUBBARD and the CHS's plans to join ISIL in Syria. JACKSON agreed to provide his AK-47 style assault rifles, as well as instruction on how to shoot them, to HUBBARD and the CHS. The plan was to hold this training on or about July 16, 2016, and JACKSON acknowledged that the purpose would be to prepare HUBBARD and the CHS to fight for ISIL. JACKSON said that he wished he could do more to help HUBBARD and the CHS. JACKSON also advised HUBBARD and the CHS to lie to the passport people about where they were going. JACKSON stated that he wished he could go to Syria with them.

53.    On or about July 15, 2016, HUBBARD and JACKSON met with the CHS and made plans with CHRISTIAN to hold target practice at the same South Florida wildlife management area on or about the next day. The CHS brought up the terrorist attack that had occurred in Nice, France, on July 14, 2016; however, JACKSON and HUBBARD were unaware that the attack had happened. When the CHS provided details of the attack, HUBBARD exclaimed "Alhamdulillah," meaning "praise be to Allah," and JACKSON exclaimed "Allah Akhbar," meaning "Allah is great."

54.    On or about July 16, 2016, CHRISTIAN, JACKSON, the CHS, and a known individual, drove to the target practice location. HUBBARD was not present. At one point

19

CHRISTIAN and JACKSON indicated that they did not have enough ammunition. JACKSON said that HUBBARD had taken the ammunition left over from the last shooting session. After purchasing ammunition, both CHRISTIAN and JACKSON referred to the group's shooting activity as a "training session." CHRISTIAN spoke about ISIL training people and sending them back to their homelands to conduct attacks. CHRISTIAN opined that it hurts the enemies of ISIL more to attack their homelands than to kill them on the battlefield. The group discussed the Nice attack and spoke approvingly of the perpetrator's reported connections.

55.     Upon arrival at the wildlife management area, JACKSON brought out the same weapons used during the firearms training on or about July 9, 2016. JACKSON also provided several paper targets. The CHS brought CHRISTIAN's Romanian-manufactured AK-47 style rifle. The CHS asked CHRISTIAN if he/she could keep it for more training and CHRISTIAN agreed. JACKSON described his Mosin Nagant sniper rifle as accurate up to one mile and noted that he intends to use it "when the time comes." CHRISTIAN claimed to have another AK-47, which he described as a pistol. Both CHRISTIAN and JACKSON provided detailed firearms instruction to the CHS, describing how accurate the weapons were and demonstrating the proper position for handling and firing them. CHRISTIAN showed the CHS how to load, unload, and break down the AK-47 style rifle. JACKSON brought gun oil and showed the CHS how to clean the shotgun. The CHS observed JACKSON place his pistols, shotgun, and two AK-47 style assault rifles in his grey Volkswagen sedan after the "training session" had concluded.

56.     On or about July 18, 2016, HUBBARD and JACKSON met the CHS and discussed the shooting in Baton Rouge, Louisiana, where three police officers had been killed. HUBBARD praised the attacker for killing the "kuffar," and both HUBBARD and JACKSON stated "Alhamdullilah," or "praise be to God." The CHS asked HUBBARD how much money

he was planning to bring on the trip to Syria, and HUBBARD responded that he would bring $6,000. The CHS explained the currency declarations requirements and warned HUBBARD that amounts over $10,000 could be confiscated in Europe. HUBBARD gave the CHS several boxes of artwork for him to store in his/her garage, and commented that it is likely he would stay in Syria and not return. HUBBARD stated that CHRISTIAN had informed him about the recent weapons training session and, based on CHRISTIAN's report, praised the CHS's handling of the firearms.

57.     The group then began to discuss JACKSON's Mosin Nagant sniper rifle. JACKSON showed the CHS a steel round, which the CHS observed to be approximately 1.5 times larger than a 7.62 x 39mm round. JACKSON advised that the steel round was capable of piercing body armor and could not be used at an indoor shooting range because it would go through the wall. JACKSON said that he would be taking the Mosin Nagant sniper rifle to the gunsmith later that day for repairs. HUBBARD and JACKSON expressed interested in conducting another firearms training session, and discussed where to hold their farewell dinner. The CHS observed JACKSON place the Mosin Nagant sniper rifle in the trunk of his grey Volkswagen sedan when the meeting had concluded.

58.     On or about July 21, 2016, HUBBARD, JACKSON, and the CHS traveled from West Palm Beach to Miami International Airport so that HUBBARD and the CHS could depart for Syria. JACKSON drove HUBBARD and the CHS in his grey Volkswagen sedan. After JACKSON dropped HUBBARD and the CHS off, HUBBARD and the CHS obtained their boarding passes at the ticket counter. HUBBARD and the CHS cleared through the TSA checkpoint at which point HUBBARD was arrested. JACKSON was arrested after he left the airport premises. CHRISTIAN was arrested at his place of work. In a post-<u>Miranda</u> statement,

CHRISTIAN stated that he had possessed four firearms in the last year, including the AK-47 style assault rifle.

## Conclusion

59.     Based on the foregoing, I submit that there is probable cause to believe that GREGORY HUBBARD, DAYNE ANTANI CHRISTIAN and DARREN ARNESS JACKSON, in the Southern District of Florida, have knowingly conspired and attempted to provide material support and resources to a designated FTO, that is, ISIL, in violation of 18 U.S.C §§ 2339B(a)(1) and 2.  This includes the provision of personnel.  Further, I submit there is probable cause to believe that DAYNE ANTANI CHRISTIAN, having previously been convicted of a crime punishable by imprisonment for a term exceeding one (1) year, did knowingly possess a firearm in and affecting interstate and foreign commerce, in violation of 18 U.S.C. § 922(g)(1).

**FURTHER YOUR AFFIANT SAYETH NAUGHT.**

BRIAN KING
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

Subscribed to and sworn before me in
Miami, Florida, this 22nd day of July 2016.

HON. CHRIS M. MCALILEY
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF FLORIDA

22