UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH

CASE NO. 16-80107-CR-ROSENBERG

UNITED STATES OF AMERICA,

vs.

GREGORY HUBBARD,

      Defendant,

_____/

## **MOTION TO DISMISS FOR OUTRAGEOUS GOVERNMENT CONDUCT**

Mr. Gregory Hubbard, through undersigned counsel, moves this Court to dismiss the indictment based on outrageous government conduct and in support thereof states:

## **ARGUMENT**

A.    <u>Introduction</u>

"Whoever fights monsters should see to it that in the process he does not become a monster. And when you look long into an abyss, the abyss also looks into you."

Friedrich Nietzsche, *Beyond Good and Evil* 89 (Walter Kaufmann trans., Vintage Books 1966) (1886).

In the instant motion Mr. Hubbard respectfully asserts that the charges against him should be dismissed by this Court. In so urging, he is fully cognizant that motions to dismiss premised upon outrageous government conduct are rarely justified, and thus rarely granted. *United States v. Pemberton*, 853 F.2d 730, 735 (9th Cir. 1988) (per curium). He is also aware that the relief he requests is

extraordinary and the dismissal of his indictment would be seen in certain quarters as a setback.

The treatment of Mr. Hubbard, a natural born citizen of the United States, tarnishes this nation's character, is shameful in its disrespect for the rule of law, and should never be repeated. As such, the government's myriad and sundry Constitutional violations against Mr. Hubbard have divested it of jurisdiction to prosecute him in the instant matter.

B.    Legal Standard

Mr. Hubbard seeks to dismiss the indictment lodged against him based on the government's outrageous conduct in condoning, colluding, and adopting the CHS's targeting, investigating, recruiting, grooming, and manipulating Mr. Hubbard and then attempting to hobble Mr. Hubbard's Constitutional rights to a fair trial, due process, and confrontation.

The doctrinal origins of this motion are found in the dicta of a decision authored by then-Justice Rehnquist: "[W]e may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction . . . ." *United States v. Russell*, 411 U.S. 423, 431-32 (1973). The *Russell* majority indicated that governmental conduct would be constitutionally impermissible only where it went beyond "that 'fundamental fairness, shocking to the universal sense of justice' mandated by the Due Process Clause of the Fifth Amendment." *Id.* (quoting *Kinsella v. United States ex rel. Singleton*, 361 U.S. 234, 246 (1960)). In *Russell* the defendant was convicted of

2

manufacturing methamphetamine. *Russell*, 411 U.S. at 424. He argued that the charges should be dismissed because the informant provided him with an essential chemical so that he could complete the manufacturing process. *Id.* at 425. The Supreme Court held that the informant's "contribution of [the essential chemical] to the criminal enterprise already in process was scarcely objectionable" because "[t]he chemical is by itself a harmless substance and its possession is legal." *Id.* at 432. Also, it was clear from the evidence in the case that the defendant Russell was already engaged in illegal activity—manufacturing methamphetamine—before the informant came into the picture. *Id.*

In keeping with the Supreme Court's view, the Eleventh Circuit has held repeatedly that it "recognized the defense of outrageous governmental conduct." *United States v. Sanchez*, 138 F.3d 1410, 1413 (11th Cir. 1998); *see, e.g., United States v. Mulherin*, 710 F.2d 731, 735 (11th Cir. 1983) ("Government involvement in criminal schemes can be so outrageous that it offends due process."); *United States v. Savage*, 701 F.2d 867, 868 (11th Cir. 1983) ("This circuit has recognized that a due process violation may result when the government's enforcement techniques reach a certain level of outrage.").

Despite the failure of most courts to dismiss or reverse a conviction based upon outrageous government conduct, the Supreme Court cautioned that "we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction . . . ." *Russell*, 411 U.S. at 431-32.

A number of courts have read the Supreme Court's warning in *Russell* to confine the broad due process check on the conduct of law enforcement officers only to that small category of cases in which the police have been brutal**,** employing physical or psychological coercion against the defendant. *See United States v. Kelly*, 707 F.2d 1460, 1476 n.13 (D.C. Cir. 1983) (per curium) (citing cases) (reversing district court dismissal for outrageous conduct in government sting of public officials). This articulation of what constitutes outrageous government behavior relies on the *Russell* court's citation to *Rochin v. California*, 342 U.S. 165 (1952), as an example of the type of government activity that would so "shock the conscience" that it would violate due process. 411 U.S. at 432. In *Rochin*, police officers broke into the defendant's bedroom and unsuccessfully attempted to prevent the defendant from swallowing contraband drug capsules.   The police took the defendant to the hospital where doctors forcibly pumped his stomach to retrieve the capsules. 342 U.S. at 166. The Supreme Court held:

> [W]e are compelled to conclude that the proceedings by which this conviction was obtained do more than offend some fastidious squeamishness or private sentimentalism about combating crime too energetically. This is conduct that shocks the conscience. Illegally breaking into the privacy of the petitioner, the struggle to open his mouth and remove what was there, the forcible extraction of his stomach's contents – as this course of proceeding by agents of government to obtain evidence is bound to offend even hardened sensibilities. They are methods too close to the rack and the screw to permit of constitutional differentiation.

*Id.* at 172.

The Supreme Court has consistently held that due process is offended when government conduct is so egregious that it "shocks the conscience" and violates the "decencies of civilized conduct." *County of Sacramento v. Lewis,* 523 U.S. 833, 846

4

(1998) quoting *Rochin*, 342 U.S. at 172-73.   According to the Supreme Court, the due process guarantees of the Constitution were intended to prevent government officials "from abusing [their] power, or employing it as an instrument of oppression." *Collins v. Harker Heights,* 503 U.S. 115, 126 (1992) (quoting *DeShaney v. Winnebago County Dept. of Soc. Servs.,* 489 U.S. 189, 196 (1989) and *Davidson v. Cannon,* 474 U.S. 344, 348 (1986)).

One example of outrageous government conduct meriting dismissal is found in *United States v. Toscanino*, 500 F.2d 267 (2d Cir. 1974).   In *Toscanino*, the defendant was wanted on a narcotics warrant out of the Eastern District of New York. *Id.* at 268. The defendant was an Italian national living in Uruguay who had been abducted and forcibly brought to the United States to face prosecution. *Id.* The defendant maintained, both pretrial and after his conviction, that the entire prosecution against him was void due to the fact that the United States illegally kidnapped him from his home in Uruguay and tortured him during his transport to the United States. *Id.* at 269-70. The defendant's motions to vacate his conviction and dismiss the indictment were denied without a hearing, and those denials were the sole issue on appeal. *Id.* at 271. The court remanded the case for an evidentiary hearing to determine whether the defendant's claims of forcible abduction and torture could be sustained. *Id.* at 281.

In resolving the dispute, the *Toscanino* court had to reconcile long-standing Supreme Court precedent holding that the manner in which a defendant is brought to the territory of the United States was immaterial, and could not offend due process. *See Ker v. Illinois*, 119 U.S. 436, 444 (1866) (power of court to try defendant

5

not impaired by the fact that he was forcibly abducted); *Frisbie v. Collins*, 342 U.S. 519, 522 (1952) (due process merely requires the defendant's presence at the time of conviction after being appraised of the charges and after a constitutionally valid trial).

While acknowledging the continued validity of *Ker* and *Frisbie*, the court in *Toscanino* held that intervening Supreme Court precedent had diluted their strict application. 500 F.2d at 874. The Court found that *Rochin's* holding, invalidating a state court conviction based on the brutal manner in which evidence had been extracted from the defendant, as well as the holding in *Mapp v. Ohio*, 367 U.S. 643 (1961), that the Fourteenth Amendment's Due Process Clause applied the protections of the Fourth Amendment to defendants in state court proceedings, had eroded *Ker* and *Frisbie's* disinterest in the conduct of law enforcement in bringing a prosecution. *Toscanino*, 500 F.2d 273-74.   These developments led the court to conclude that "due process . . . now requir[es] a court to divest itself of jurisdiction over the person of a defendant where it has been acquired as the result of the government's deliberate, unnecessary and unreasonable invasion of the accused's constitutional rights." *Id*. at 275.

In ruling that the defendant's allegations of outrageous government conduct, if sustained on remand, should result in the dismissal of the indictment, the *Toscanino* court noted that many cases involving due process violations center on unlawful government acquisition of evidence and that, in those instances, the proper remedy would be the exclusion of the tainted evidence. *Id*.   However, it noted that where suppression of the evidence would not suffice, the indictment should be dismissed so

that the government would not benefit from its illegal conduct. *Id.* (citing *Wong Sun v. United States*, 371 U.S. 471, 488 (1963)).

Even before the arrest of the defendant, *i.e.* during the investigative and pre-indictment stage of a case, the Eleventh Circuit recognized that government misconduct could violate "that fundamental fairness, shocking to the universal sense of justice mandated by the due process clause of the fifth amendment." *United States v. Edenfield*, 995 F.2d 197, 200 (11th Cir. 1993) (quoting *United States v. Tobias*, 662 F.2d 381, 386-87 (5th Cir. Unit B 1981) and *Russell*, 411 U.S. at 432).   In order to completely bar prosecution, government misconduct must be "outrageous." *Edenfield*, 995 F.2d at 200. In evaluating the outrageousness of government misconduct, a court must look at the totality of the circumstances, with no single factor controlling. *See Tobias*, 662 F.2d at 387.

In *Tobias*, the former Fifth Circuit declared that the tactics at issue "set the outer limits to which the government may go in the quest to ferret out and prosecute crimes in this circuit." 662 F.2d 381, 387 (5th Cir. Unit B 1981).[1]  In *Tobias*, the DEA established a sham chemical supply company and advertised in High Times magazine. *Id.* at 383. The defendant contacted the company and placed an order for various chemicals. *Id.* But he later canceled his order because, as he told the undercover DEA agent posing as a company representative, he found manufacturing cocaine to be extremely difficult and expensive to manufacture. *Id.* The undercover DEA agent then suggested that the defendant try manufacturing PCP because it was

---

[1] On October 1, 1981, the United States Court of Appeals for the Fifth Circuit was divided to create the new (and current) Fifth and Eleventh Circuits. In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

as easy as "baking a cake" and that for $500 he would send the defendant everything he needed. *Id.* Tobias agreed and ordered the necessary supplies, which were shipped to him. *Id.* He was later prosecuted for conspiracy to manufacture and possess PCP with intent to distribute. *Id.* at 383-84.

The former Fifth Circuit declined to find outrageous government conduct because Tobias and his wife initiated each of the contacts with the DEA undercover agents. *Id.* at 387. This formed the crux of the court's reasoning and holding: "It is this predisposition plus active and insistent participation that sets this case apart" from cases in which a due process violation was found. *Id.* at 386. It then unequivocally drew a bright line, noting that while it is permissible for the government agent to supply something of value to the defendant,

> the government may not instigate the criminal activity, provide the place, equipment, supplies and know-how, and run the entire operation with only meager assistance from the defendants without violating fundamental fairness.

*Id.* at 386 (citing *United States v. Twigg*, 588 F.2d 373, 378 (3rd Cir. 1978).

In drawing the bright line about what government agents can and cannot do, the *Tobias* court relied on the Third Circuit's decision in *Twigg*. *Tobias*, 662 F.2d at 386 (citing *Twigg*, 588 F.2d at 378). The Third Circuit in *Twigg* determined that the government's agents violated due process despite the fact that both defendants were predisposed to engage in methamphetamine offenses. *See id.* at 376. Summing up its analysis, the court observed that

> When Kubica, at the insistence of the DEA, reestablished contact with Neville, the latter was not engaged in any illicit drug activity. Using Kubica, and actively participating with him, the DEA agents deceptively implanted the criminal design in [co-defendant Neville's] mind. They set him up, encouraged him, provided him the essential

8

supplies and technical expertise, and when he and [a cooperating witness] encountered difficulties in consummating the crime, they assisted in finding solutions. This egregious conduct on the part of the government agents generated new crimes by the defendant merely for the sake of pressing criminal charges against him when, as far as the record reveals, he was lawfully and peacefully minding his own affairs. Fundamental fairness does not permit us to countenance such actions by law enforcement officials and prosecution for a crime so fomented by them will be barred.

*Id.* at 381. Accordingly, the Third Circuit held that "the foregoing reasons mandate the reversal of [co-defendant] Neville's conviction.' *Id.*

This case resembles the circumstance of co-defendant Neville in *Twigg* in almost every respect. At the time the CHS established contact with Mr. Hubbard, Mr. Hubbard was not engaged in any illegal activity—to the contrary, Mr. Hubbard served honorably in the United States military and has no prior arrests or charges, much less convictions. *See id.* at 381 (co-defendant Neville was not engaged in any illicit drug activity at time informant reestablished contact with him). The CHS in this case, along with law enforcement agents, "conceived and contrived" the scheme that the CHS presented to Mr. Hubbard. *See id.* at 378 ("we also have before us a crime, unlike Hampton, conceived and contrived by government agents"). It was the CHS, at the instruction and encouragement of the FBI, that "deceptively implanted the criminal design in [Mr. Hubbard's] mind." *Id.* The CHS encouraged, goaded, and provoked Mr. Hubbard to agree to the scheme the CHS had masterminded with the FBI—

*Id.* When Mr. Hubbard balked or ignored the CHS, the CHS provoked him

The CHS made it abundantly clear that

his friendship ████████████████████████████████████████████████████████
████████████████████████████████████████████ was contingent on Mr. Hubbard agreeing with whatever the CHS said and whatever the CHS wanted him to do, including embarking on the trip. The CHS did everything he could to "generate new crimes by [Mr. Hubbard] merely for the sake of pressing criminal charges against [Mr. Hubbard] when, as far as the record reveals, [Mr. Hubbard] was lawfully and peacefully minding his own affairs." *Id.* at 379, 381.

While dismissal of the indictment is warranted under *Twigg* for the conduct of the CHS and FBI alone, when the conduct of government counsel in this case is added to the equation, the scales of justice tip heavily towards dismissal.

In a nation of laws and respect for the dignity of all persons, the manner in which Mr. Hubbard was targeted for investigation and then recruited, groomed, and set up by the confidential human source ("CHS") is disturbing in and of itself. The CHS sought to exploit Mr. Hubbard's emotional and financial vulnerabilities for ██ personal benefit ██████████████████████████

████████████████████████████████████████████████████████
████████████████████████████████████████ ████████ ████████████
████████
████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████ ██ ██████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████ ██

█████████████████████████████████████████████

███████████████████████████████████ ██ ███

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
█

The CHS's ██████████ history ████████████████████████████

standing by itself is sufficiently troubling. ██ ██████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████ ██ ███████████████████████████████████. While

one could argue that the government could not be held accountable █████████████

████████████████████████████████████████ the facts

demonstrate that the government was not only aware but complicit.

In the ██ years of working with the CHS, the government was aware of the

CHS's longstanding ████████████████████ vendetta, ████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

11

███████████████████████████████ ██ ███████████████████████████

███████████████████

Then, during the ███ years which Mr. Hubbard was targeted, recruited, groomed, and set up by the CHS leading to his indictment in this case, the government was not only aware but complicit in the CHS's ████████████ ███████ vendetta, █████████████████████████ ██ ████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████ This allowed the government to not only conserve its financial resources in this investigation but also reduce the impact of impeachment ████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ███████████████████

In the case against Mr. Hubbard and his co-defendant, the CHS was doing precisely as the government continually instructed, directed, coached, required, and demanded that he do. ████████████████████████████████ ████████████████████████████████████████████



The government mentored and colluded with the CHS in how to misrepresent and mislead each of the co-defendants ██████████████. The government inculcated the need for the CHS to fabricate artificial fuel from each of the co-defendants to throw on the lone spark that the CHS and the government repeatedly sought to set aflame. As such, the government steered the CHS into concocting ploys that the CHS would manipulate the defendants into attending, ████ so that the government could then argue that the defendants acquiescence in light of unrelenting pressure from the CHS counted as overt acts or substantial steps towards the commission of the substantive offenses.



Yet while government counsel was arguing that it did not have to comply with Mr. Hubbard's discovery demands regarding the CHS until the week before trial (and conditioned the co-defendants' guilty pleas upon their waivers of any *Brady* and *Giglio* evidence),

Indeed, had this Court not ordered government to disclose the benefits received by the CHS and other impeachment information three months before trial, ████████████████████████████ Mr. Hubbard would be left without a remedy for the government's complicity in hampering his Constitutional rights to a fair trial, confrontation, and due process.

Subtracting the CHS's role as mastermind, ████████████████, Mr. Hubbard's conduct falls purely within the realm of political speech that has always received the greatest form of Constitutional protection. In dissent in a case affirming a conviction under the Espionage Act during World War I, Justice Holmes admonished

But as against dangers peculiar to war, as against others, the principle of the right to free speech is always the same. It is only the present danger of immediate evil or an intent to bring it about that warrants Congress in setting a limit to the expression of opinion where private rights are not concerned. Congress certainly cannot forbid all effort to change the mind of the country. Now nobody can suppose that the surreptitious publishing of a silly leaflet by an unknown man, without more, would present any immediate danger that its opinions would hinder the success of the government arms or have any appreciable tendency to do so.

*Abrams v. United States*, 250 U.S. 616, 628 (1919) (Holmes, J., dissenting).

It cannot be overstated that without the CHS "conceiving and contriving" the scheme, "deceptively implanting it in [Mr. Hubbard's mind," ████████████ ████████████████████████████████████████████████████████ that Mr. Hubbard would have been merely another Black Muslim man in America disillusioned, disenfranchised, and disgusted by the tragedies and injustices inflicted upon him, denouncing the government for whom he served in the military that refused to support or recognize his humanity due to his politically-powerless and unpopular race and religion.

Furthermore, despite that knowledge and complicity and despite knowing of Mr. Hubbard's significant mental health issues, the government caused him, upon his arrest, to be removed from the medical ward and transferred to solitary confinement when he was incarcerated at the Palm Beach County Jail. The government sought to intimidate and coerce Mr. Hubbard into submission with every weapon in its arsenal: extreme isolation, deprivation of sensory stimuli, deprivation of his sole source of comfort (his religious materials), inability to review the audio and video recordings—the crux of the government's case—against him and assist in his own defense, and meals that forced Mr. Hubbard to choose between compliance with

15

his sincerely-held religious beliefs or adequate nutrition that would not be a gruel of beans and rice three meals a day, seven days a week, in perpetuity. The coercive pressure was aggravated by the fact that, even after undersigned counsel was able, with the assistance of the Court, to effectuate Mr. Hubbard's transfer from Palm Beach County Jail to the Federal Detention Center ("FDC") in Miami and then finally his transfer from FDC's Special Housing Unit ("SHU") to General Population, Mr. Hubbard was still faced with the unconscionable choice between, on one hand, protecting his physical and mental health and, on the other, being able to meet with his court-appointed attorneys and investigators or exercising his constitutional right to be present at all court proceedings. Exercising his constitutional right to be present at all court proceedings would entail his transfer to and detention in solitary confinement at the Palm Beach County Jail.

It is telling that the government required the co-defendants to waive their rights to receive *Brady* and *Giglio* evidence, to withdraw their guilty pleas, to appeal their sentence absent an upward variance, and to collaterally attack their convictions in exchange for their ability to cooperate for a lesser sentence as a condition of the plea agreements *See* [DE 107 ¶¶ 10-11, 14-17]; [DE 112 at ¶¶ 9, 11-12, 14-17]. These plea agreement provisions ensured that the co-defendants made their decision to plead absent *any* evidence regarding the conduct and background of the CHS and the conduct of the FBI and government. *See* [DE 107 ¶ 16]; [DE 112 ¶ 16]. Further, the plea agreements then immunized the government from what would happen later once the co-defendants learned about evidence that would undermine and discredit the CHS, the FBI, and the government's conduct. *See* [DE 107 ¶¶ 16-17]; [DE 112 ¶¶

16-17].

Extended periods of solitary confinement are the most severe deprivation of liberty—short of the death penalty—that the government can impose. More than a century ago, the Supreme Court recognized the extreme implications that accompany solitary confinement. In considering a habeas corpus action by a prisoner sentenced to death, the Court held that the Colorado state court had violated the Ex Post Facto Clause when it ordered the imposition of solitary confinement on the petitioner pending the death sentence because the enacting legislation enabling the imposition of solitary confinement was passed after the criminal act was committed.   In doing so, the Court noted that solitary confinement had a checkered history in the United States, and that it had fallen out of favor in the mid-1800s due to the finding that:

> a considerable number of the prisoners fell, after even a short confinement, into a semi-fatuous condition, from which it was next to impossible to arouse them, and others became violently insane; others still, committed suicide; while those who stood the ordeal better were not generally reformed, and in most cases did not recover sufficient mental activity to be of any subsequent service to the community.

*In re Medley*, 134 U.S. 160, 168-70 (1890).

Modern medical and scientific research confirms the Supreme Court's turn-of-the-century observation that solitary confinement can result in severe psychiatric harm:

> Social science and clinical literature have consistently reported that when human beings are subjected to social isolation and reduced environmental stimulation, they may deteriorate mentally and in some cases develop psychiatric disturbances.   These include perceptual distortions, hallucinations, hyperresponsivity to external stimuli, aggressive fantasies, overt paranoia, inability to concentrate, and problems with impulse control.   This response has been observed not only in the extreme case where a subject in a clinical setting is completely isolated in a dark soundproofed room or immersed in water,

but in a variety of other contexts.  For example, similar effects have been observed in hostages, prisoners of war, patients undergoing long-term immobilization in a hospital, and pilots flying long solo flights.   While acute symptoms tend to subside after normal stimulation or conditions are returned, some people may sustain long-term effects ... There is also an ample and growing body of evidence that this phenomenon may occur among persons in solitary or segregated confinement – persons who are, by definition, subject to a significant degree of social isolation and reduced environmental stimulation.

*Madrid v. Gomez*, 889 F. Supp. 1146, 1230-1231 (N.D. Cal. 1995) (citing Stuart Grassian, M.D., *Psychopathological Effects of Solitary Confinement*, 140 Am. J. Psychiatry 1450 (1983)).

The effects of solitary confinement are exacerbated when combined with the deprivation of sensory stimuli and other aggravating factors. Dr. Donald O. Hebb of McGill University conducted some of the pioneering studies on the effects of isolation. His research focused on the effects of isolation and sensory deprivation upon human beings and found that such isolation formed a new torture paradigm, producing what was termed "disordered brain syndrome."

The experiments of Hebb and others . . . who have concerned themselves with "sensory deprivation," have consisted of putting men into situations where they received no patterned input from their eyes and ears, and as little patterned input as possible from their skin receptors . . . . The subjects were deprived of opportunity for purposeful activity. All of their bodily needs were taken care of--food, fluids, rest, etc. Yet after a few hours the mental capacities of the participants began to go awry.

Lawrence E. Hinkle, Jr., *The Physiological State of the Interrogation Subject as it Affects Brain Function* in *The Manipulation of Human Behavior* 28-29 (Albert D. Biderman & Herbert Zimmer eds., 1961).

The Supreme Court recognized the deleterious effects of isolation well over a century ago. That wisdom has only been further bolstered by the study and

experimentation of modern psychiatry. Even for brief durations, subjects exposed to extreme isolation suffer great mental pain. That pain is logically augmented when combined with severe deprivation of sleep and sensory stimuli. Given what is known about the effects of these methods of torture, it is unimaginable what pain Mr. Hubbard experienced when he was exposed to these methods, and more, for time he has.

The isolation, sleep deprivation, lack of sensory stimuli, indistinguishable gruel of rice and beans for every meal, and the embargo of religious materials for the prolonged period of time suffered by Mr. Hubbard meets accepted scientific definitions of torture. That Mr. Hubbard was subjected to an experience that meets the scientific definition of torture based upon ███████████ motive of the CHS and the complicity of the government satisfies the "shocks the conscience" standard.

The remedy of dismissal begins to make whole the prejudice suffered by Mr. Hubbard due to outrageous government conduct.

## CONCLUSION

The facts underlying Mr. Hubbard's case distinguish it factually and legally from *Russell, Hampton*, and their progeny and provide ample grounds for this Court to dismiss the indictment based upon outrageous government conduct in violation of Mr. Hubbard's due process rights under the Fifth Amendment to the United States Constitution.

In closing, the following words of dissent have often been repeated in the recognition that we, as a Nation, ignore the government's violation of law at our peril:

19

> Decency, security, and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperiled if it fails to observe the law scrupulously. Our government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means – to declare that the government may commit crimes in order to secure the conviction of a private criminal – would bring terrible retribution. Against that pernicious doctrine this court should resolutely set its face.

*Olmstead v. United States*, 277 U.S. 438, 485 (1928) (Brandeis, J., dissenting).   In defending this Nation against the threat of terrorism it is neither necessary nor proper for our government to abandon the bedrock principles upon which this Nation was founded.   All that is sacred in our national life is secured by the promise that this is a Nation of laws and not of men.

Through its illegal conduct, the government has forfeited its right to prosecute Mr. Hubbard in the instant matter.   Mr. Hubbard respectfully requests that this Court dismiss the indictment against him for the government's outrageous conduct.

Respectfully Submitted,

**MICHAEL CARUSO**
**FEDERAL PUBLIC DEFENDER**

By:   */s/ Vanessa L. Chen*
　Vanessa L. Chen
Assistant Federal Public Defender
Florida Special A No.: A5501529
150 W. Flagler Street, Suite 1700
Miami, Florida 33130-1556
Tel: (305) 530-7000
Fax: (305) 536-4559
E-mail: vanessa_chen@fd.org

By:   */s/ Anthony J. Natale*
　Anthony J. Natale
Supervisory Assistant Federal Public Defender
Florida Bar No. 296627
150 West Flagler Street - Suite 1700
Miami, Florida 33l30
Tel: (305) 533-4246
Fax: (305) 536-4559
Email: anthony_natale@fd.org

20

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY certify that on **August 4, 2017**, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or *pro se* parties via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

*/s/ Anthony J. Natale*

Anthony J. Natale
